74 F.Supp. 900 (1947)
KNIGHT
v.
FINNEGAN.
No. 5313.
District Court, E. D. Missouri, E. D.
December 18, 1947.
George S. Roudebush, of St. Louis, Mo., for plaintiff.
Theron Lamar Caudle, Asst. Atty. Gen., Andrew D. Sharpe and Fred S. Gilbert, Jr., Sp. Assts. to the Atty. Gen., Drake Watson, U. S. Atty., of New London, Mo., and Wm. V. O'Donnell, Asst. U. S. Atty., of St. Louis, Mo., for defendant.
HULEN, District Judge.
Plaintiff, as administrator of the estate of James G. McConkey, seeks recovery of estate taxes paid by virtue of inclusion in decedent's gross estate of sum paid decedent's widow by the Retirement System of the Federal Reserve Banks.[1] Defendant denies liability. The pleadings present one question: Should the payment of $18,645.88 made by the Retirement System of the Bank to the widow be classified as "insurance" under Section 811(g) of the Internal Revenue Code? 26 U.S.C.A. Int. Rev. Code, § 811. If the question is answered in the negative, judgment should be for defendant  if in the affirmative, judgment should be for plaintiff. The case is for ruling on agreed statement of facts.
Mr. McConkey died February 4, 1942. On March 1, 1934 the Retirement System of the Bank became effective. On the latter date McConkey was, and had been for many years, an employee of the Bank. He became a member of the Retirement System by virtue of his employment without physical examination. He became 65 years of age approximately one month after the System became effective. He retired March 1, 1938. Under the rules of the Retirement System McConkey contributed a percentage of his salary and the Bank made contribution to the System, for credit *901 to Mr. McConkey's membership certificate. When McConkey retired there was in the Retirement System to his credit $30,145.88, $5,086.88 contributed by McConkey and $25,059 by the Bank. The contributions of Mr. McConkey and the Bank were calculated according to regulations for the System. Section 5(6) reads: "From time to time the Retirement Committee shall adopt a table of normal rates of contributions [for employing banks], showing for each age at entrance the level percentage of salary which if contributed throughout active service for a new member entering the membership at that age, is calculated on the basis of mortality and service tables to be sufficient to provide for all pensions, death benefits, and other expenses on his account payable from the contributions of an employing bank. * * *"
At the time Mr. McConkey retired he had certain rights of election to convert the retirement allowance into one of four plans provided in the regulations.[2] Had he left the service of the Bank before retirement he had other and different rights. In addition there was the normal method of payment (which became operative if no election was made) by which Mr. McConkey would receive for life a retirement allowance of $250 per month. Under the normal plan if he died before having consumed the $30,145.88 to his credit, the unconsumed balance was paid to his designee, or if he survived his designee, then to his estate. While not required to so elect, Mr. McConkey designated the normal plan of settlement at the time of his retirement. On March 17, 1938, by letter from the Retirement System, Mr. McConkey was advised that his retirement had been approved and that he would receive $250 a month for the remainder of his life and that any balance of the $30,145.88 remaining at the time of his death would be paid to his named beneficiary, Mrs. McConkey, or, if she did not survive him, then to his estate. At the time of Mr. McConkey's death he had received $11,500 from the Retirement System, leaving $18,645.88[3] which was paid to his widow. In filing the estate tax return the payment to the widow was set up as insurance under Section 811(g), Internal Revenue Code, and credit claimed under the $40,000 exemption allowed by statute. The Commissioner ruled the payment to the widow was not insurance and should be included in the gross estate. A deficiency of $3,304.78 was assessed, paid, and plaintiff now seeks its recovery, with interest.
The parties, represented by able counsel, have presented briefs which draw contrary conclusions of law, from the same state of facts. We think there can be no dispute as to the meaning of the term "insurance" in its commonly accepted sense,
"Life insurance is defined as `a mutual agreement by which one party agrees to pay a given sum upon the happening of a particular event contingent upon the duration of human life, in consideration of the *902 payment of a smaller sum immediately, or in periodical payments by the other party.'
"It is also defined as `a contract by which insurer for a certain sum of money or premium proportioned to the age, health, and other circumstances of the person, whose life is insured, engages that, upon the death of such person, within the period limited in the policy, insurer shall pay the sum specified in the policy according to the terms thereof.' 37 C.J., p. 359, § 1.
"Moreover, the elements and requisites of an insurance policy are, among others, `a risk or contingency insured against and the duration thereof.' `A promise to pay or indemnify in a fixed or ascertainable amount.'" See, Carroll v. Equitable Life Assur. Soc. of United States, D.C., 9 F. Supp. 223, 224.
"An examination of the authorities does not warrant the conclusion that an annuity contract is an insurance contract. It may be defined as `a yearly payment of a certain sum of money granted to another in fee for life or for years, and charging the person of the grantor only.' 2 R.C.L., § 1, p. 2. * * *
"The granting of annuity contracts is in the nature of an investment and has very little to do with mortality tables. The only case where a mortality table would be involved is where the annuity is granted for the life of an individual. In such case, the grantor would, of course, take into consideration the `expectancy' of such person under accepted mortality tables." 9 F.Supp. 224.
Plaintiff argues that the facts of this case brand the fund paid as insurance because McConkey "paid a consideration and his employer paid a consideration". With this we cannot agree. It is further contended the payments into the fund were calculated at amounts, based on mortality tables, to provide not only a service retirement allowance but "also a death benefit". Plaintiff stresses the repeated use of the term "death benefit" in the certificate of membership and the regulations. Also that under options 2 and 3 the beneficiary "could have received back more than the amounts paid" to the System for Mr. McConkey's account. The terms in the certificate and the regulations, to which plaintiff has directed attention, are applicable to insurance contracts but we are not prepared to hold that, standing alone, they are controlling in determining if the instrument is an insurance contract. The Carroll case did not involve insurance as the term is used in Section 811(g) of the Act, but that such definitions of insurance and annuity as are found in the Carroll case are applicable was ruled in the case of Helvering v. Le Gierse, 312 U.S. 531, 61 S.Ct. 646, 85 L.Ed. 996. The Supreme Court said: "Analysis of the apparent purpose of the partial exemption granted in § 302(g) [26 U.S.C.A. Int.Rev. Code, § 811(g)] strengthens the assumption that Congress used the word `insurance' in its commonly accepted sense. Implicit in this provision is acknowledgment of the fact that usually insurance payable to specific beneficiaries is designed to shift to a group of individuals the risk of premature death of the one upon whom the beneficiaries are dependent for support. Indeed, the pith of the exemption is particular protection of contracts and their proceeds intended to guard against just such a risk. * * * Hence, the next question is whether the transaction in suit in fact involved an `insurance risk' as outlined above." (312 U.S. loc.cit. 540, 61 S. Ct. loc. cit. 649, 85 L.Ed. 996.)
In the same opinion the Court contrasts the features of an annuity contract and an insurance contract: "The fact remains that annuity and insurance are opposites; in this combination the one neutralizes the risk customarily inherent in the other. From the company's viewpoint, insurance looks to longevity, annuity to transiency." (312 U.S. loc.cit. 541, 61 S.Ct. loc.cit. 650, 85 L.Ed. 996.)
The optional provisions contained in the regulations do not have a material bearing on interpreting the contract now before the Court. Up to the time of Mr. McConkey's retirement the relation between him and the Retirement System was indefinite to the extent that on retirement, or resignation prior to retirement, he had certain *903 optional rights. Each of the options accorded to Mr. McConkey under the rules of the System, on election, created a different obligation on the System. Assuming, without deciding, that under options 2 and 3 death benefits of an insurance character were provided, obligations of the character referred to in options 2 and 3 were eliminated when Mr. McConkey retired and rejected options 2 and 3 and elected to receive benefits under the normal plan. At time of retirement the contract between the System and Mr. McConkey became fixed, definite, and conclusive. We must view the rights of the parties, as found in the terms of the contract which became final on Mr. McConkey's retirement.
"We think the fair import of subsection (g) [of Sec. 811] is that the amounts must be received as the result of a transaction which involved an actual `insurance risk' at the time the transaction was executed." See Helvering v. Le Gierse, supra, 312 U.S. loc.cit. 539, 61 S.Ct. loc.cit. 649, 85 L.Ed. 996.
"Only on the exercise of the right of election, either by the promisor or by the other side, to whom the right may pass on his failure, does the obligation become absolute and determinate." 17 C.J.S., Contracts, § 455.
Use of mortality or actuarial tables in determining the amount of contribution to the fund was necessary in view of the wide range of options granted the members. Such tables are used in writing annuity contracts and are applicable to annuity and insurance contracts.
Giving full effect to all the claims of plaintiff, collectively and separately, as they apply to the contract between the Retirement System and Mr. McConkey, after his retirement when the terms of the contract became fixed, the question still remains, was the sum received by the beneficiary "insurance" under the Act? Applying the law of the Le Gierse case we find, on the record, that the Retirement System took no risk, based on the death of Mr. McConkey, to pay his beneficiary any sum of money. The Retirement System was obligated by the terms of the contract (represented principally by the regulations of the System) to pay $30,145.88, regardless of how long Mr. McConkey lived. Mr. McConkey's death cast no financial burden on the Retirement System that was not already there. The Retirement System was not bound to pay any sum on McConkey's death except in the event they had not paid the whole of the amount to the credit of Mr. McConkey during his life. He had exhausted over $11,000 of the amount to his credit before his death. Had he lived approximately six years longer, his death would have relieved the Retirement System of financial responsibility on his certificate of membership in the Retirement System. It follows that there was no undertaking involving a risk by the Retirement System for it to indemnify anyone for loss resulting from death. The sole effect of McConkey's death was to determine the time when and the person to whom the remainder (if any) of the sum due from the Retirement System was to be paid.
Under the ruling of the Supreme Court in the Le Gierse case we conclude the payment to the beneficiary of the balance remaining to the credit of Mr. McConkey on his death was not "insurance" as contemplated by the Revenue Act.
On a state of facts as similar to those now before the Court as any we have been able to find, the United States Board of Tax Appeals, in Re Estate of O'Shea, 47 B.T.A. 646, on a like contention as that which plaintiff here makes, ruled against the taxpayer and the decision was based upon the Supreme Court decision in the Le Gierse case:
"In our opinion, when petitioners' decedent died, he owned a contract providing for the payment of an annuity to him and an offsetting death benefit to his named beneficiaries. The System assumed no `insurance risk' in that contract. Any such risk inherent in the death benefit obligation was neutralized by the annuity provision. Thus we think Helvering v. Le Gierse, 312 U.S. 531, 61 S.Ct. 646, 85 L.Ed. 996, is controlling. Upon the authority of that decision we hold, (1) that none of the contested payment is `insurance' under section 302(g) *904 of the Revenue Act of 1926, as amended [26 U.S.C.A. Int.Rev. Code, § 811(g)], and (2) all of it is properly includable in the estate of decedent for Federal estate tax purposes under section 302(c) of the same act."
The Supreme Court in the Le Gierse case approved a previous ruling of the Eighth Circuit Court of Appeals in Helvering v. Tyler, 111 F.2d 422. We think the following, from the opinion in the Tyler case, applicable to the facts of the case at bar:
"The claim that the sum was exempt because it was receivable as insurance on the life of Mr. Tyler is colorable merely. The company assumed no pecuniary risk in respect to the duration of Mr. Tyler's life. It made no examination as to his insurability and he was beyond the age of those whose lives it made a practice of insuring. Practically all life insurance policies include a promise to pay a sum certain at the death of the persons to whom they are issued, and as one of the provisions of the company's $44,000 transaction with Mr. Tyler was that it would pay his widow $40,000 at his death, the policy form lent itself to cover that part of their agreement. But in the absence of any actual insuring of Mr. Tyler's life there could be and there was no money receivable by the widow as insurance within the meaning of the exemption from the provisions of Section 302(g).
"* * * There was no insuring of a human life against loss by death, and the form or semblance of life insurance created by the bisection of the agreement into two documents was unreal." (111 F.2d loc.cit. 426, 427)
We have considered the cases cited by plaintiff. Estate of Snyder v. Commissioner, 5 T.C. 1391; In re Fitzsimmons' Estate, 158 Misc. 789, 287 N.Y.S. 171, affirmed 248 App.Div. 862, 291 N.Y.S. 168; Karnochan v. United States, Ct.Cl., 29 F. Supp. 860; Wilson v. Commissioner, 42 B.T.A. 1196. In our opinion they are distinguishable from the facts in this case.
Judgment will go for the defendant. Let findings of fact, conclusions of law and decree be settled and submitted under the Rule.
NOTES
[1] Hereinafter referred to as Bank.
[2] "Option 1. A retirement allowance payable during his life, in an increased amount with the provision that at his death all payments shall cease and no further amounts shall be due or payable, or

"Option 2. A retirement allowance payable during his life, in a revised amount with the provision that it shall continue after his death for the life of the beneficiary nominated at the time of retirement, should such beneficiary survive him, or
"Option 3. A retirement allowance payable during his life, in a revised amount with the provision that it shall continue after his death at one-half of the rate paid to him, and be paid for the life of the beneficiary nominated at the time of retirement, should such beneficiary survive him, or
"Option 4. An immediate or deferred retirement allowance payable during his life with some other benefit payable after his death, provided the total value of the allowance during his life and the succeeding benefit shall be computed to be of equivalent actuarial value to the allowance or other benefit which he would receive without optional modification and provided the benefit be approved by the Retirement Committee."
[3] Pension portion of unexpended
 reserve $15,408.66
 Annuity portion of unexpended
 reserve 3,237.22
 __________
 $18,645.88